J-S11018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: L.S.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1630 WDA 2025 |

Appeal from the Order Entered November 12, 2025
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s): 2025-00218

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.:                     **FILED: May 29, 2026**

J.B. ("Mother") appeals from the order entered on November 12, 2025, in the Court of Common Pleas of Clarion County Orphans' Court, which involuntarily terminated her parental rights to L.S.B. ("Child").[1, 2]  After careful review, we affirm.

### Background

We glean the following relevant facts and procedural history from the certified record.  Mother and Father are the biological parents of two young sons, Child (born September 2020) and R.B. (born January 2024).  ***See***

---

[1] D.G.'s ("Father") parental rights to Child were also terminated on the same date.  Father filed a separate appeal with this Court, which is addressed in a separate memorandum at No. 1629 WDA 2025.

[2] A guardian *ad litem* ("GAL"), Zach Shekell, Esquire, and a child advocate, LaVieta Lerch, Esquire, were appointed to represent the best interests and the legal interests of Child.  Order, 9/10/25 (single page).  Both attorneys participated in the termination hearing.

Petition for Involuntary Termination of Mother's Parental Rights ("Petition"), 9/5/25, at ¶¶ 2-3; N.T., 11/10/25, at 6-7.[3]  The parties do not live together and have never been married.  Petition at ¶¶ 3-4.

Child was initially adjudicated dependent on February 1, 2024, due to Mother and Father's drug use and housing instability, and was placed into foster care.  *Id.* at ¶ 9.  That dependency was terminated on January 10, 2025, at which time Child was returned to Mother's care.  *Id.*  However, four days later, on January 14, 2025, Child was again removed from Mother's custody after being found outside, unattended, and improperly attired in the middle of the night.  *Id.*  Both parents were located inside Mother's residence and were unaware Child had left the residence.  *Id.*  Mother and Father both tested positive for illegal substances.  *Id.*  On January 24, 2025, Child was adjudicated dependent for a second time and returned to foster care.  *Id.* at ¶ 5; *see also id.* at ¶ 6 (indicating Child was removed from Mother's care due to Mother's drug use, periods of incarceration, and lack of stable housing).

---

[3] Clarion County Children & Youth Services ("CYS") received a referral regarding Mother's testing positive for methamphetamines and THC the day after the birth of R.B.  *See* N.T. at 6.  R.B. was immediately removed from Mother's care and adjudicated dependent on February 1, 2024.  *Id.* at 8. Mother ultimately signed a petition voluntarily relinquishing her parental rights to R.B., which was approved by the orphans' court on November 10, 2025. *See id.* at 135-38, 142.  The termination of Mother's parental rights to R.B. is not subject to this appeal; thus, our focus here is on the evidence as it pertains to Child.  However, when relevant to the issues on appeal, we refer to Child and R.B. collectively as "Children."  Further, we note Father's parental rights to R.B. were involuntarily terminated on November 10, 2025; he did not appeal that decision.  *See id.* at 139-40.

Following the January 14, 2025 incident, Mother admitted to improperly utilizing prescription medications and was incarcerated due to a probation violation. *Id.* at ¶ 9. She subsequently attended inpatient drug and alcohol treatment from February 5 through March 5, 2025, and then began regularly attending outpatient drug and alcohol treatment. *Id.* In June 2025, Mother failed to meet with her probation officer, fled, and a warrant was issued for her arrest. *Id.* Mother was located on July 1, 2025, tested positive for methamphetamines, and was incarcerated from July 1 to July 21, 2025. *Id.*; N.T. at 36.

On September 5, 2025, CYS filed a petition seeking the involuntary termination of Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. In its petition, CYS indicated Child had been in foster care for 15 of the past 22 months. Petition at ¶ 9. It further averred Mother had been unable to maintain her sobriety and stabilize her living situation and, thus, the circumstances which resulted in Child's removal had not been remedied. *Id.*

A termination hearing was held on November 10, 2025, at which CYS presented the testimony of caseworkers Erin Schrecengost, Amanda Gregory, and Dakota Curran. Mother testified on her own behalf and proffered the testimony of J.M. ("Maternal Grandmother") and Alisha Blice, the program manager at the Center for Community Resources ("CCR") in Clarion. We summarize the testimony of the parties' witnesses, in pertinent part, as follows.

- 3 -

*Erin Schrecengost*

Erin Schrecengost — the initial CYS caseworker assigned to the family — indicated the agency received its first referral regarding Child in January of 2024. N.T. at 7. Ms. Schrecengost conveyed, prior to that referral, Mother had left Child in the care of her sister ("Maternal Aunt") because Mother did not have stable housing or the ability to get Child any type of medical treatment. **Id.**; **see also id.** (noting Mother had last taken Child to the doctor in September 2021). After more than a year of caring for Child, Maternal Aunt reached out to CYS requesting Child be removed from her home, as she could no longer care for him. **Id.** Ms. Schrecengost indicated Child was then removed from the home and placed into foster care on January 29, 2024. **Id.**; **see also id.** at 8 (stating Father had other dependent children and was not an appropriate placement option for Child at the time).

Following Child's initial adjudication on February 1, 2024, reunification goals were put in place for Mother. **Id.** at 8. Ms. Schrecengost explained those goals included maintaining a sober lifestyle, stabilizing her mental health, improving her parenting skills, and providing for the basic needs of her Children. **Id.** at 9-12. She reported Mother made progress towards her goals. **Id.** at 8. Specifically, she conveyed Mother attended inpatient drug and alcohol treatment at Glenbeigh in Ohio from February 6 to March 6, 2024. **Id.** at 9. Upon her discharge from Glenbeigh, she regularly attended outpatient drug and alcohol treatment at CenClear and submitted to random drug and alcohol screens, all of which were negative. **Id.** Mother also participated in

mental health counseling at Clarion Behavioral Health and completed the Nurturing Parenting program on June 6, 2024. *Id.* at 11. Ms. Schrecengost testified, however, Mother struggled to obtain appropriate housing. *Id.* at 12. She indicated Mother eventually located temporary housing at Hope Homes, which does not generally permit children to reside within its program, but it made an exception for Mother so she could reunite with her Children. *Id.* Based on Mother's progress, CYS returned Children to Mother's care on October 17, 2024. *Id.* After monitoring the transition and ensuring Mother was maintaining her sobriety and mental health, the dependency for both Children was terminated on January 10, 2025. *Id.* at 13.

Ms. Schrecengost reported, however, that only four days later, on January 14, 2025, Children were once again removed from Mother's care and placed into shelter care. *Id.* at 13-14. She recounted:

> The police had received a phone call in the middle of the night that [Child] was … running around the neighborhood unsupervised, and he had shown up to a neighbor's home and told the neighbors that his mother had died and that he needed help. [Child] didn't have any coat on, didn't have shoes on, didn't have socks on, and it was thirteen degrees outside. The police were able to track … [C]hild's footsteps in the snow, which led to [Mother's] apartment, and the door was wide open.

*Id.* at 14; *see also id.* at 23 (Ms. Schrecengost's noting Child witnessed Mother's having a seizure and opining that is why he thought she died). The police found both Mother and Father present at Mother's residence; they both tested positive for illegal substances. *Id.* at 14. Children were adjudicated

dependent for a second time on January 24, 2025, and both were returned to their previous foster homes. *Id.* at 15.

Ms. Schrecengost relayed, following the second removal of Children from her care, Mother admitted to "crushing and snorting Wellbutrin that was not prescribed to her." *Id.* According to Ms. Schrecengost, Mother said "her mental health had declined, so she … began using Wellbutrin." *Id.* Children were dependent with CYS at the time Mother started using Wellbutrin, so Ms. Schrecengost inquired why she did not ask CYS for help. *Id.* Mother replied "she wanted the case to close and for everything to go away." *Id.* Ms. Schrecengost further explained Mother had been on bail for prior criminal charges at the time she admitted to illegal drug use, so her bail was revoked and she was incarcerated in the Clarion County Jail "for a little less than a month." *Id.* at 15, 33.

Ms. Schrecengost remained the family's caseworker during Child's second dependency until early June 2025. *Id.* at 16. She explained reunification goals were again put in place for Mother. *Id.* Due to her relapse with drug use, Mother's primary goal was to obtain and maintain a sober lifestyle. *Id.* Mother returned to inpatient treatment at Glenbeigh from February 5 to March 5, 2025. *Id.* After successfully completing that program, Mother reenrolled in outpatient treatment at CenClear and regularly attended those sessions through the beginning of June 2025, when Ms. Schrecengost ceased to be the family's caseworker. *Id.* Mother also submitted to random drug screens. *Id.* at 16-17. Ms. Schrecengost reported the only time Mother

tested positive for a non-prescribed substance while she remained the caseworker was on April 4, 2025, when Mother tested positive for Benzodiazepine. *Id.* at 17. She explained Mother provided her "with documentation that she was given Ativan at Clarion Hospital two days prior, and I screened her again April 23rd, and she was negative for all substances at that time." *Id.*

Ms. Schrecengost indicated another goal for Mother was stabilizing her mental health, since she had previously reported her declining mental health led to her substance use. *Id.* Ms. Schrecengost further explained Mother was participating in Behavioral Health Court through Clarion County after her release from incarceration, which required her to engage in regular mental health treatment. *Id.*; *see also id.* (stating Mother's mental health diagnosis includes bipolar disorder, depression, anxiety, and Post-Traumatic Stress Disorder ("PTSD")). As such, Ms. Schrecengost stated Mother regularly attended bi-weekly mental health treatment sessions through early June 2025. *Id.* at 18.

Regarding housing, Ms. Schrecengost testified Mother returned to Hope Homes after her release from incarceration and rehab. *Id.* However, due to the previous incident which resulted in Children's removal, Hope Homes would no longer allow Mother to have Children reside there with her. *Id.* Thus, Mother was attempting to locate appropriate housing for herself and Children. *Id.* Ms. Schrecengost stated, "[Mother] had got [*sic*] on the Clarion County Housing list, and I believe the last time I had heard an update, she was …

third or fourth on the list…." *Id.* at 24; *see also id.* (noting "this was probably the end of May[ 2025]").

At a review hearing on June 2, 2025, Ms. Schrecengost reported CYS was not planning on proceeding with termination "as long as [Mother] was maintaining her level of progress. But if she did not maintain her progress, [CYS] would look to file [for] termination of [her] parental rights." *Id.* at 19-20. Ms. Schrecengost confirmed Mother was present for that hearing, so she was aware of CYS's expectations. *Id.* at 20.

When asked about visitations, Ms. Schrecengost conveyed Mother was "always appropriate" with Child and there was mutual affection between the two. *Id.* at 21-22. She added, "Sometimes [Child] would have some behaviors and [Mother] typically responded well to them and there were no issues that I could observe at visits." *Id.* at 21. Ms. Schrecengost indicated she had also observed Mother with Child in the home and reported Mother had been able to control Child's behaviors "for the most part[.]" *Id.* at 25. Mother took Child to play therapy; Child graduated from the program. *Id.* Mother also attended most of Child's medical appointments. *Id.* at 26.

In response to a question regarding whether Mother has a bond with Child, Ms. Schrecengost replied:

> I don't feel that I'm in a position to answer that. I have not seen them interact since some time ago. When I did see them interact, it was positive. I think [Mother] does care about [Child] and [Child] cares about her too, however, there are some other issues as far as her being able to handle his behaviors and care for him I believe.

*Id.* at 25.

When questioned by the GAL regarding the incident which led to Child's second removal, Ms. Schrecengost opined it had a lasting effect on Child. *Id.* at 32. She said when she would visit Child, he would often bring up that night and tell her his mom died. *Id.* He was saying similar things to his foster family as well. *Id.* She explained Child is in therapy to help him deal with the trauma from that night and being returned to foster care, and she expressed concerns regarding the effect Mother's "further relapse or instability" could have on Child's mental health. *Id.*

*Amanda Gregory*

CYS Caseworker Supervisor Amanda Gregory was assigned to this case in June 2025, following Ms. Schrecengost's involvement with the family. *Id.* at 35. She reported Mother was initially making progress with her reunification goals. *Id.* However, on July 2, 2025, CYS received an update from Mother's probation officer, indicating Mother had been incarcerated again. *Id.* at 35-36. Ms. Gregory recalled:

> [The probation officer] indicated [Mother] had failed to show up at one of her probation checks at the office, so they went … to Hope Homes to find her, and then they discovered … [Mother] was leaving through the back door at Hope Homes[. S]o then they issued a warrant out for her arrest and she was subsequently incarcerated on July 1, 2025.

*Id.* at 36. Upon her apprehension, Mother was drug screened and tested positive for methamphetamines. *Id.* She also admitted to using alcohol at a party the prior weekend. *Id.* Mother remained incarcerated until July 21,

2025. *Id.* Following her release, she attended inpatient rehab until she was successfully discharged from the program on September 4, 2025. *Id.* She then recommended outpatient treatment with CenClear on September 11, 2025. *Id.* at 37. Ms. Gregory emphasized Mother was not able to have any contact with Child for a little over two months during her period of incarceration and rehab. *Id.*

Mother resumed visitation on September 14, 2025. *Id.* Ms. Gregory testified there were no reported issues regarding Mother's interactions with Child during visits. *Id.*; *see also id.* (noting Mother brought food and toys for Child; describing their interactions as "appropriate"). However, after visits resumed in September 2025, Ms. Gregory said the foster parents reported a significant increase in Child's behaviors in the home. *Id.* She explained, when Child returns from visits with Mother, "he will say things to [the foster parents] like, … they don't like him anymore and … they're just trying to send him away back home." *Id.* at 38. She also indicated Child has exhibited increased aggression and defiance, stating:

> So, he's had increased generalized aggression, like[] hitting himself. He also makes statements like[] he's a bad boy, like[] nobody loves him, just very low self-esteem. Sometimes he'll have a meltdown, and it will take him hours to deescalate from it. … [H]e just stays at an elevated level for extended periods of time that is not typical for his age.

*Id.*; *see also id.* at 46 (adding "it's hard to pinpoint what triggers him sometimes, but he'll get triggered and just kind of have a meltdown … and it will just last for hours without the ability for him to calm down or be co-

regulated with an adult"). She explained Child is in play therapy to help him process the experiences he went through and to learn to deescalate some of his behaviors. *Id.* at 38. CYS also made a referral to the Child and Adolescent Service System Program ("CASSP") to determine whether there are any additional services available for Child. *Id.*

CYS decided to pursue termination of Mother and Father's parental rights and filed its petitions on September 5, 2025. *Id.* at 39. Ms. Gregory explained CYS has concerns with Mother's ability to maintain and stabilize her mental health or sobriety for an extended period of time. *Id.* at 39-40. She said, "It appears that there's a period of time of sobriety, relapse, incarceration, and then a period of sobriety again, but those cycles end up being like a couple months at a time." *Id.* at 40; *see also id.* (recognizing for the 22 months prior to CYS's seeking termination, Mother's pattern had been "use of substance, incarceration, rehab, a period of sobriety, and then use, incarceration, rehab"). Ms. Gregory declared this pattern has prevented Child from having stability. *Id.* She noted that as of the date of the termination hearing, Child had been in foster care for 18 of the past 22 months, had no contact with Mother for "[a] total amount of five months[,]" and had only been in Mother's care for three months. *Id.* at 39-40; *see also id.* at 41 (adding Child had been in Maternal Aunt's care for one year prior to his initial removal).

Due to Mother's inconsistency and inability to maintain stability with her reunification goals for an extended period, Ms. Gregory recommended terminating her parental rights to Child. *Id.* at 49. She stated:

[Mother] has been in inpatient rehab … three times in the past two years where she has a period of sobriety and then a period where she again relapses and is using substances. She is currently living at her mother's house. … There are concerns with … Mother's ability to maintain when [she hasn't] demonstrated that ability in the past two years that [CYS] has been involved.

*Id.* Ms. Gregory added, the first time CYS closed the dependency, Mother was using substances without CYS's knowledge. *Id.* She shared, "[T]hat's a main concern of reunification if [Mother] was relapsing and using and hiding it from [CYS] and [CYS] closes [the dependency] and we get into a situation where we get reinvolved again because that is just another trauma for [Child] to endure." *Id.* at 49-50.

In Ms. Gregory's opinion, termination would be in Child's best interest, because he deserves a chance to have stability, to live in a home without substance abuse, and to receive interventions for his behavioral problems. *Id.* at 50-51. Ms. Gregory noted Child's current foster parents are not a permanency resource for him, because they believe "due to [Child's] behaviors, … he would do better in a household where he's the only child so he can get the one-on-one attention … he needs." *Id.* at 47. However, she indicated CYS has located a potential pre-adoptive family for Child. *Id.* Further, Ms. Gregory testified when she asks Child if he wants to be at Mother's house, "he shakes his head no." *Id.* at 51.

### Dakota Curran

CYS Caseworker Dakota Curran was assigned to this case in September 2025. *Id.* at 58. Mr. Curran testified Mother is currently living in New Bethlehem with her mother. *Id.* at 60. He visited her residence at the beginning of November 2025 and relayed there is "a small bedroom that they had been fixing up" for Child, "but it would need [to be] furnished." *Id.* Mr. Curran said he has not had any other meetings with Mother, aside from serving her with notice of the termination hearing in September, and indicated Mother has been cooperative with CYS since his involvement with the case. *Id.*

### Mother

Mother acknowledged reunification goals were put in place for her during Children's first dependency. *Id.* at 63. In order to reach her mental health and sobriety goals, Mother testified she did "[e]verything … [she] could possibly do." *Id.* at 64. She elaborated:

> I did Behavioral Health Court.[4] I got right into mental health and, you know, at first it was weekly that I did mental health, and then it was biweekly, and then I went to CenClear for drug and alcohol, my one-on-ones. Three days a week, I had three-hour groups, and I got stepped down to just the one-on-ones in the first period that [Children] were in custody.

---

[4] Mother explained Behavioral Health Court requires her to attend mental health treatment and drug and alcohol treatment, meet with CCR once a week, go to probation once a week, and meet with the judge every other week to report her progress. N.T. at 71. As of the termination hearing date, Mother was still active in Behavioral Health Court. *Id.*

*Id.* (cleaned up).  In addition, Mother recalled she successfully completed inpatient rehabilitation at Glenbeigh in March 2024.  *Id.*  Regarding her visitation, Mother said beginning in March 2024, she was able to build up significant periods of time with Children and was eventually permitted overnights before Children were returned to her care in mid-October of that year.  *Id.* at 65.  She conveyed her visits at the time with Child went "[p]retty good.  Occasionally he had a little bit of an outburst at the end of the visit because he didn't want to leave…."  *Id.* at 66; *see also id.* (indicating Mother took Child to play therapy to help with his behavior).  Mother admitted to being "overwhelmed" when she "got both of the boys back home."  *Id.* at 68. She said when it was just Child, "[i]t was as it should be.  I was pretty confident in the way things were going.  Everything was stable."  *Id.*

When asked what happened on the night which led to Children's second removal in January 2025, Mother recounted:

> I'm assuming it was like 10:30 or 11:00 at night.  From my point of view, I woke up to police in my face and was disoriented because I had had a seizure, but I didn't know that I had had a seizure because, you know, it's just the way seizures work.  You come out of it unknowing what had happened, and I was disoriented, and he was asking me where my children were.  And coming out of a seizure, it didn't even register to me that the police were there and why, but I assumed that both of the boys were in the house, you know.  [R.B.] was in bed, sleeping, and I must have just realized that [Child] was not in bed when I had the seizure, but he said for me to look and see if the boys were in the house.  … [S]o I did, and [Child] was missing….  It occurred to me that I had to have had a seizure because … I have a brain disorder called temporal mesial sclerosis.  It causes seizures and memory loss.

*Id.* at 66-67. Mother tested positive for fentanyl, but insisted "[i]t was a false positive." *Id.* at 67. She admitted to taking several prescription medications at the time, including Wellbutrin. *Id.* During cross-examination, Mother could not recall whether she went to the emergency room to be treated the night of the incident, but said she was sure she had a seizure that night because "it's the only thing that made any sense…." *Id.* at 88. She explained she was diagnosed with a seizure disorder years ago. *Id.* at 87. Mother further indicated she has been diagnosed with bipolar 1 disorder, PTSD, anxiety, and major depressive disorder. *Id.* at 89.

Mother believes the January 14, 2025 incident had a lasting impact on Child, stating Child often brings that night up "in detail." *Id.* at 68. She said, "He's talked about it several times at the visits. I know that he's been traumatized because of the incident. He's never seen me have a seizure without other people present to help." *Id.* at 69.

Regarding her history with substance abuse, Mother recalled she started using drugs when she was 12 and said she has been using methamphetamines on and off since 2018. *Id.* at 85. She explained Child had been living with Maternal Aunt prior to his initial removal because Mother was in the process of moving, her electricity was shut off, and Mother was "high" and needed to get sober. *Id.* at 86. Mother testified to snorting Wellbutrin after Children were removed from her care in January 2025. *Id.* at 88; *see also id.* (Mother's stating she reported her Wellbutrin use to probation because she knew she needed help). Mother further admitted to relapsing on

methamphetamine in June 2025, despite having just attended the June 2, 2025 review hearing, at which CYS indicated it would not seek termination so long as Mother continued to progress towards her goals. *Id.* at 81. She said her relapse in June was because she was "depressed, dealing with this process, and knowing that [she] was going to … suggest the adoption of [R.B.]…. [I]t pushed [her] over the edge trying to think of letting him go." *Id.* at 86. According to Mother, she has been sober since June 29, 2025. *Id.* at 71.

Mother believes she will be able to provide permanency for Child in the near future. *Id.* at 73. When asked about her inability so far to maintain long-term sobriety, she responded:

> When [Children] first were taken back in January 2024, from that point, clean up until October, whenever they put [Child] back in my care, I did everything that was asked of me, and then some. You know, I did my best to work on self-care and my behavior problems that I've been working on most of my life. I feel like in January [2025,] when they were re-taken for the second time, it was overwhelming to have both of the boys at home and pretty much doing everything for them myself. I received that urine [test] and it came back false positive for the fentanyl, and I knew it was wrong and had them send it out, and I did not use prior to the seizure. I impulsively, after they took the Children the second time, seeked [*sic*] medication and did not fail at the probation—I called the probation office and told them that they took my kids for the false positive—well, I didn't know it was—I knew it was negative, but they didn't have results back yet, but I did take the medication impulsively because I had felt that everything that I had worked for was nothing. So, I relapsed directly after they took [Children], not prior to that incident. And then from that point, after I went to jail and back to rehab for the second time, I kind of just shut down a little bit, quite a bit actually, because the biggest stressor that I've had … since that point, was knowing that it is not in [R.B.'s] best interest to be with me, but I didn't want

- 16 -

to accept that, so I ended up relapsing again just in June and went back to rehab, of course, and this time … I made myself come to the terms that were necessary. I do not think that it is in [R.B.'s] best interest to leave the home that he's in. He has everything that he needs. I've come to accept that. It took a long time for that to happen. I feel like … in the last couple of years of my life, well, since [Child] was born actually, I have changed my life drastically. The only thing that was holding me up mostly was the housing, and I have the housing now. It took a year and a half for me to get up on the HUD list for that. I did relapse a couple times. I'm not, you know, not taking any denial on any of that. I did it, but I've made significant change in my life for my boys and myself. I just feel like … 97% of the time that [Children] have been gone and I've been working on staying sober, I've done everything.

*Id.* at 73-74.

When questioned whether she thinks she is going to be able to maintain her sobriety and mental health while dealing with the behaviors Child has been exhibiting recently, *i.e.*, extreme emotional outbursts that last for hours and disrespect, Mother stated, "I've done it before." *Id.* at 82. Child's counsel asked Mother "what is different now" or "what assurance" could she give that when faced with pressure while caring for Child, she would not turn to drugs again. *Id.* at 83-84. Mother replied:

Well, as I previously said, the biggest pressure that I've had over the last couple of years is … doing what is best for [R.B.] and I wanted to take on that responsibility and try, but if I'm willing to have him adopted out, then [Child] has all the one-on-one time that he needs and—I mean, at the end of the day, I don't see an image without [Child], and I'll do anything that it takes to keep him home and safe and … I don't want to sound like I don't care about [R.B.], because I do, but I can't provide for the both of them for what they need, and I can spend all the time that I need with [Child].

*Id.* at 84. Mother also indicated she has a support system of "many people" now. *Id.* at 75.

Mother testified she is currently living with Maternal Grandmother and her "little sister," Ja.B. *Id.* at 63; *see also id.* at 70 (acknowledging Hope Homes would no longer allow her to stay in her old apartment with her Children). She indicated Maternal Grandmother's home has "a whole room" for Child. *Id.* at 70. She stated Child has a bond with Maternal Grandmother and calls her "Grandma." *Id.* at 70-71. Mother explained she had applied for a housing voucher before Children were initially removed from her care and finally obtained the voucher at the end of October 2025. *Id.* at 70. Mother said now she must simply find a place. *Id.*

Mother indicated she does not currently have any income. *Id.* at 75. She said she applied for disability in March 2024 due to her brain disorder and her mental health, but her application was denied and she is now in the appeal process. *Id.* at 75, 80, 88. However, she noted Maternal Grandmother and Ja.B. have incomes, so she suggested, "there's enough income in the house that we can provide for Child." *Id.* at 75. Further, Mother speculated that if she moves out of Maternal Grandmother's home with the housing voucher she obtained, she will receive child support from Father and she could get a job. *Id.* at 80. Mother acknowledged she has some limitations due to her brain disorder and seizures, but feels she is capable of working. *Id.*

Mother testified she and Child "have a good bond." *Id.* at 69. He calls her "Mom" and talks to her "about everything." *Id.* She said the only negative

thing about their visits is that Child sometimes gets frustrated when it is time for the visit to end. *Id.* Mother claimed Child has asked her several times to "come home" with her. *Id.* She believes disrupting their bond would be harmful to Child. *Id.* at 72.

*Maternal Grandmother*

Maternal Grandmother confirmed Mother is currently residing with her, asserting Mother has lived there for "[a] few months now." *Id.* at 92. She testified her home has a third bedroom for Child, which they just finished remodeling. *Id.* at 92-93. Maternal Grandmother said she loves Child and would be willing to have him live in her home. *Id.* at 93. She also testified Mother has maintained her sobriety while living in her home. *Id.* at 93.

*Alisha Blice*

Alisha Blice, the program manager at the CCR in Clarion, "oversee[s] specialty courts, housing, BSU, and crisis." *Id.* at 95. Ms. Blice testified she became familiar with Mother when "she entered our Behavioral Health Court Program … right before she had her son, [R.B]." *Id.* at 95-96. She explained, "[T]o be in compliance with Behavioral Health Court, [Mother] has to stay up to date with her medications, therapy, drug and alcohol [treatment] if recommended, and case management services." *Id.* at 96. Ms. Blice stated, to her knowledge, Mother has been compliant. *Id.* Although during cross-examination, she explained there are three phases in the Behavioral Health Court Program, with each phase typically being six months, and acknowledged Mother's relapse in June 2025 "set her back[.]" *Id.* at 98. Ms. Blice testified

Mother is forthright about any relapses, stating Mother "usually owns her behaviors and is honest when it comes to things she struggles with." *Id.* at 96; *see also id.* at 98 (noting when Mother came back from her relapse in June 2025, "she jumped right back into the program and started pushing forward again").

Ms. Blice believes Mother is capable of maintaining consistent sobriety to establish permanency for Child. *Id.* at 96. She based this belief on her history with Mother over the course of her involvement with Behavioral Health Court. *Id.* She said, "[Mother] is always willing to put forth the effort and do what she needs to do, and I believe she is motivated by her children. That's been very important to her since the beginning when she entered the program." *Id.* at 96-97. During cross-examination, Child's counsel questioned Ms. Blice whether Mother's history of relapse and her testimony that she turns to drugs "whenever she's under a lot of stress" would change her opinion as to whether Mother could succeed in treatment court. *Id.* at 99. Ms. Blice replied, "With my experience in mental health, and in drug and alcohol, relapse is a part of recovery. It takes time. … [A]ddiction is serious, and it's part of the recovery process, but I think moving forward, [Mother] can remain stable." *Id.* When asked whether she is confident Mother will not relapse again, she said, "I cannot say to 100%, but I think that's what she wants for herself." *Id.*

Ms. Blice further indicated she "had contact with [Mother] and her boys when she was residing in our Hope Homes Program. I would stop in and see

[them]." *Id.* at 97. She described Mother's interactions with Children as "all positive." *Id.*; *see also id.* (noting one of the boys would often be sleeping, the house was always clean, and Mother was present and in the moment with Children).

Following the parties' presentation of witness testimony, both Child's legal counsel and the GAL advocated for the termination of Mother's parental rights. *See id.* at 127-28. Child's counsel argued Child has spent significant amounts of time away from Mother and needs stability and permanency. *Id.* He expressed, "[T]ermination of parental rights would be [the] first step and then moving forward to adoption." *Id.* at 128. Child's counsel also referenced the testimony regarding Child's behaviors escalating since visits with Mother resumed in 2025, stating "he's obviously reacting to the traumas that have been associated [with his parents], and I believe that he would … do well to just move on with his life." *Id.* at 127.

Similarly, the GAL agreed with CYS's recommendation to terminate Mother's parental rights. *Id.* at 128. He conveyed that Child has not been "real communicative[,]" but stated that "he likes where he is and would like to stay there." *Id.* "[T]hrough shaking his head," Child also indicated he would like to continue visits if he could. *Id.* Notwithstanding, the GAL opined:

> [Child] has had instability for his entire life it appears. He has bounced around his entire life, and he's been in foster care for eighteen and a half out of twenty-two months at this point…. [S]o I think it would be in his best interest to continue in search of a family [with whom] he would have [a] lifetime of permanency….

*Id.*

At the close of the hearing, the orphans' court issued its ruling from the bench, involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (b). **See id.** at 139-41; **see also** Order, 11/12/25 (single page).[5] On December 12, 2025, Mother filed a timely notice of appeal,[6] along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). In response, the orphans' court filed a Rule 1925(a) opinion incorporating the reasons it stated at the conclusion of the November 10, 2025 hearing for its ruling on the termination petition. Orphans' Court Opinion ("OCO"), 1/7/26, at 1.

**Issues**

On appeal, Mother presents the following issues for our review:

1. Whether the [orphans' c]ourt erred or committed an abuse of discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S.[] §[]2511(a)(1)?

2. Whether the [orphans' c]ourt erred or committed an abuse of discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S.[] §[]2511(a)(2)?

---

[5] The order terminating Mother's parental rights is dated November 10, 2025, but was not entered on the docket until November 12, 2025. Further, the docket indicates notice of the order was provided on November 12, 2025, pursuant to Pa.R.Civ.P. 236.

[6] **See** Pa.R.A.P. 903(a) (stating that "the notice of appeal … shall be filed within 30 days after the **entry of the order** from which the appeal is taken") (emphasis added); **see also** Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").

3. Whether the [orphans' c]ourt erred or committed an abuse of discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S.[] §[]2511(a)(5)?

4. Whether the [orphans' c]ourt erred or committed an abuse of discretion in terminating Mother's parental rights pursuant to 23 Pa.[C.S.] §[]2511(b)?

Mother's Brief at 5.

**Analysis**

Our standard of review is well-established:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179,] 1190[ (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Section 2511 of the Adoption Act governs the termination of parental rights and requires a bifurcated analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We consider the involuntary termination of Mother's parental rights under Sections 2511(a)(1) and (b), which provide:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)     The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

*Section 2511(a)(1)*

We begin by addressing whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(1).

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (citation omitted). Although orphans' courts should consider the whole history of the case in assessing evidence under Section 2511(a)(1) and not mechanically apply the six-month statutory provision, *see In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009), our Supreme Court has reinforced "the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence…[,]" *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021) (emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." *I.J.*, 972 A.2d at 10 (citation omitted).

Regarding parental duties, our Supreme Court has explained:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs,

physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)) (cleaned up). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citation omitted).

Instantly, Mother claims the orphans' court erred in terminating her parental rights under Section 2511(a)(1), as she "did not evidence a settled purpose of relinquishing her parental claim to … [C]hild, and to the extent she failed to perform parental duties, there exists a weighty and credible explanation." Mother's Brief at 12; *see also id.* (stating "Mother's parental duties included making progress on the family service plan goals set forth by [CYS], primarily the elimination of substance use concerns and achieving stable housing"). Mother argues during the six-month window preceding the

filing of the Petition, she was "prioritizing visitation and attending to her sobriety and counseling without issue for **half** of that window." *Id.* (emphasis added). In support, Mother avers she made herself available for screenings, regularly attended mental health counseling, and was attempting to locate appropriate housing. *Id.*; *see also id.* (noting Mother secured a housing voucher by the time of the termination hearing).

Mother acknowledges her relapse in July 2025, which led to incarceration and further rehabilitation, but argues "the cause has an explanation and a resolution." *Id.* at 13. She points to her testimony regarding her struggles to accept it was not in R.B.'s best interest to be with her, but claiming she had come to accept it. *See id.* (citing N.T. at 74, 86); *see also id.* (stating Mother voluntarily relinquished her parental rights to R.B. following the termination hearing). Mother emphasizes she had previously maintained her sobriety from March of 2024 until January 2025, and had built up substantial custodial time with Children. *Id.* at 13-14. In addition, she argues "[a]t the time of the termination hearing, she had been sober and compliant with drug counseling … for five (5) months, and was utilizing professional supports to avoid any further pitfalls." *Id.* at 14. Mother fails to convince us any relief is due on this claim.

The orphans' court found CYS met its burden in proving the termination of Mother's parental rights was warranted under Section 2511(a)(1). The orphans' court acknowledged its decision was "tough" because it believes

Mother is sincere and she has "made a lot of progress recently." N.T. at 141.

It stated:

> I give you a lot of credit for that, [Mother], and yet there's such a history here dating from when the boys were born, the struggles that you've gone through with drug[s] and alcohol, with relationships, with housing, has all prevented you from having any real length, long period of time where you were providing care for the [C]hildren yourself. You know, you weren't providing, meeting your parental duties in terms of caregiving. The relapses, three inpatient stays, incarceration, all [have] disrupted the lives of the [C]hildren. We're talking about [Child] now. And he has some traumatic effects from the incident in January[ 2025]. I'm concerned about your seizures and the relationship of drugs to not being able to handle the pressure. And so … those same reasons in terms of lack of meaningful effort and progress toward the goals that I reviewed with [Father],[7] as to §[]2511(a)(1)…, apply here to [Mother] as well….

*Id.*; *see also* OCO at 1 (explaining the orphans' court based its decision "primarily on the testimony of representatives of [CYS], and especially on the testimony of Amanda Gregory, [the] ongoing supervisor at [CYS]"). Upon review, we deem the orphans' court's factual findings to be supported by competent evidence of record, and we will not disturb its findings as to credibility. *See Q.R.D.*, *supra*; *T.S.M.*, *supra*.

The record establishes Mother has struggled with maintaining her sobriety throughout the entirety of this case. Despite her periods of sobriety

---

[7] The orphans' court found "for a period of at least six months prior to the filing of the Petition in September[ 2025], [Father] refused or failed to perform parental duties." N.T. at 139. It determined, aside from some visitation, Father had not met any of his reunification goals. *Id.* The court further observed Father had only recently made efforts towards his goals after learning of CYS's intention to seek termination and noted the court cannot take those efforts into account. *Id.* at 140-41.

and efforts to utilize the resources available to her, Mother has demonstrated a pattern of sobriety, followed by relapse, incarceration, and rehabilitation, which has prohibited her from performing her parental duties. Significantly, during the six-month period immediately preceding the filing of the Petition, Mother suffered another relapse in July 2025 and, as a result, she had no contact with Child for a little over two months. *See* N.T. at 36-37 (Ms. Gregory's testifying Mother was incarcerated from July 1 to July 21, 2025, followed by inpatient rehabilitation through September 4, 2025). CYS filed its Petition on September 5, 2025, and Mother did not resume visitation with Child until September 14, 2025. *See* N.T. at 37. While the orphans' court commended Mother for the progress she has made and her recent sobriety, with respect to a petition filed pursuant to Section 2511(a)(1), the court is expressly prohibited from considering "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). As such, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(1).

*Section 2511(b)*

As we have determined the evidence supported the involuntary termination of Mother's parental rights under Section 2511(a)(1), we next consider Section 2511(b). With respect to Section 2511(b), our Supreme Court has explained:

[C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

Here, Mother claims the orphans' court erred or abused its discretion in finding termination was warranted under Section 2511(b). Mother's Brief at 17. She contends, rather, it is in Child's best interest "for their parent-child relationship to not be severed." *Id.* at 11. In support, Mother argues the orphans' court failed to effectively evaluate the existing bond and effects of its severance. *Id.* at 17. She does not dispute or minimize how her actions have impacted Child, but argues "she and [Child] have a positive bond that should not be severed, especially when there is no replacement." *Id.* at 18; *see also id.* (asserting Child did not have a pre-adoptive placement available at the time of the termination hearing). She points to her testimony regarding her desire to bring Child home, to help with his behaviors, and to her fears he

would bounce around foster care in the event of termination. *Id.* at 18-19 (citing N.T. at 76). Further, while acknowledging it is not required, Mother notes Child's counsel "did not put [Child's] actual position on the record," and states, "it is just not clear the level of any age-appropriate discussion that occurred with 5[-]year[-]old Child through counsel regarding termination and adoption." *Id.* at 19. Again, Mother fails to convince us any relief is warranted on this claim.

First, the mere existence of a parent-child bond will not prevent the termination of parental rights. *T.S.M.*, 71 A.3d at 267. This Court has recognized the "immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent. Nurturing such emotion can, and almost always will, result in further harm to the child, as this emotion necessarily leaves the child vulnerable." *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, we have cautioned against "concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent…." *Id.*

Instantly, the orphans' court heard testimony from the witnesses proffered by CYS and Mother, as well as closing arguments by all parties.[8] After consideration thereof, the orphans' court found Mother's relapses, multiple inpatient stays, and periods of incarceration "disrupted" Child's life.

---

[8] During closing arguments, CYS, Child's Counsel, and the GAL all argued termination of Mother's parental rights is in Child's best interest. *See* N.T. at 127-28, 131-32.

N.T. at 141. Additionally, it found Child is suffering "some traumatic effects" from the January 14, 2025 incident, which led to Child's second removal. *Id.* It also expressed concern regarding Mother's seizures, her relationship with drugs, and her not being able to handle the pressure of caring for Child. *Id.* Thus, the court concluded under Section 2511(b), Child "will not suffer any adverse consequences from termination … of [M]other's rights." *Id.* at 141-42.

CYS agrees with the orphans' court's decision. It argues that while it had not yet identified a pre-adoptive home for Child at the time of the termination hearing, the termination of the bond between Mother and Child is in Child's best interest. CYS's Brief at 13-14. CYS opines the instability created by Mother's inability to maintain her sobriety has had a significant, negative impact on Child. *See id.* at 14. It explains, Child has

> suffered from aggression, self-injury, and low self-esteem[,] exhibited by statements that he was a "bad boy" and "no one loves him[."] Even after engaging in play therapy, [Child] still struggled with such behaviors and the behaviors only increased upon resuming visitation with Mother after her release from her third inpatient stay. The severity of his behaviors was impacting the agency's ability to locate a permanency resource for [him].

*Id.* at 14-15 (citations to record omitted).[9] Likewise, Child's counsel points to Ms. Gregory's testimony regarding Child's "generalized aggression, hitting himself, saying he's a bad boy, saying no one loves him, just very low self-esteem, not being able to regulate himself when he gets escalated or

---

[9] The GAL joins in CYS's appellate brief.

triggered, and … meltdown behaviors[,]" as examples which establish Child "is suffering emotionally[.]" Child's Brief at 13 (citation omitted); *see also id.* at 13-14 (noting Child's behaviors "have significantly gotten worse since visitation recommenced with Mother").

Additionally, we recognize a pending adoption is not a prerequisite to termination of parental rights involving an agency such as CYS. *See* 23 Pa.C.S. § 2512(b)(3) ("[I]f the petitioner is an agency, the petitioner shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists."). Rather, the existence of a pre-adoptive home is but one factor to be considered when contemplating termination under Section 2511(b). *See T.S.M.*, 71 A.3d at 268-69. Significantly, our Supreme Court has made clear in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id.* Instantly, CYS advised the orphans' court it is confident the agency will find Child "a permanency option that's appropriate and will provide him the necessary stability that he needs and the services he needs." N.T. at 131; *see also id.* at 47 (Ms. Gregory's testifying CYS has located a potential pre-adoptive family for Child).

Finally, Child's counsel contends the trial court properly terminated Mother's parental rights pursuant to Section 2511(b), as Child has a right to

"stability and permanency in a home environment." Child's Brief at 16. Counsel asserts he has evaluated the evidence as it relates to Child's legal rights and has determined termination aligns with Child's "legal right to timely permanency and … minimize[s] the length of time [Child] must spend in foster care." *Id.* He emphasizes "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* at 18 (quoting *In the Interest of R.J.T.*, 990 A.2d 777, 788 (Pa. Super. 2010), *rev'd on other grounds*, 9 A.3d 1179 (Pa. 2010) (citation omitted)).[10]

Upon review, it is clear the orphans' court prioritized the needs and welfare of Child in considering the effects of severing any existing bond

_____

[10] To the extent Mother questions whether Child's counsel ascertained Child's position regarding termination, Child's counsel asserts: "Trying to explain the [termination] process and determine … [C]hild's position at his young age would be either met with incomprehension or detrimental affect [*sic*] on his emotional well-being." Child's Brief at 15-16. Our Supreme Court has declared "significant deference must be accorded to counsel's approach in discerning a child's preferences and the child's articulation thereof." *In re P.G.F.*, 247 A.3d 955, 966 (Pa. 2021). Accordingly, it deemed "concern for a child's physical, mental, and emotional well-being to be a valid consideration when counsel attempts to discern the child's preference." *Id.*; *see also id.* at 966 n.8 (deeming "a useful rule of thumb" the position of *Amici* KidsVoice *et al.* that a six-year-old child is "not developmentally capable of comprehending and processing abstract and complex ideas and concepts, such as … termination of parental rights and adoption, nor is a child this age capable of making meaningful decisions involving these concepts") (citation omitted); *In re Adoption of K.M.G.*, 240 A.3d 1218, 1237-38 (Pa. 2020) ("[W]e find nothing in the language of the Adoption Act requiring that [the child's] preference be placed on the record…. Moreover, we observe that the child's legal counsel has a duty of confidentiality to their client, such that they should not be compelled to disclose the child's preferences.").

between Mother and Child. **_See K.T._**, **_supra_**. As there is competent evidence in the record supporting the orphans' court's findings, we conclude the orphans' court did not abuse its discretion in terminating Mother's parental rights under Section 2511(b).

Accordingly, we affirm the orphans' court's November 12, 2025 order involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/29/2026